United States Court of Appeals,

Eleventh Circuit.

No. 94-6708.

UNITED STATES of America, Plaintiff-Appellee,

v.

James Glenn ORTON, Defendant-Appellant.

Jan. 23, 1996.

Appeal from the United States District Court for the Northern District of Alabama. (No. CR-94-AR-44-S), William M. Acker, Jr., Judge.

Before HATCHETT, DUBINA and BLACK, Circuit Judges.

BLACK, Circuit Judge:

James Glenn Orton pled guilty to four counts of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of mail fraud, in violation of 18 U.S.C. § 1341. He was sentenced to 33 months' incarceration to be followed by 3 years' supervised release. He appeals his sentence, objecting to the way the district court calculated the amount of the loss used to determine the offense level enhancement pursuant to U.S.S.G. § 2F1.1(b)(1).[1] This appeal raises the issue of how "loss" should be determined under § 2F1.1 for cases involving a "Ponzi" or pyramid scheme,[2] where a defendant

---

[1]Orton also raises the issues of whether the sentencing court erred in finding that (1) Bill Downey was a vulnerable victim; (2) Sandra Anthony suffered foreseeable psychological harm and danger of insolvency; and (3) Orton used a special skill in committing the crimes. These issues are without merit.

[2]The "modus operandi of a Ponzi scheme is to use newly invested money to pay off old investors and convince them that they are "earning profits rather than losing their shirts.' " *United States v. Holiusa,* 13 F.3d 1043, 1048 n. 1 (7th Cir.1994) (Manion, J. dissenting) (citing *Bosco v. Serhant,* 836 F.2d 271, 274 (7th Cir.1987), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988)). The scheme takes its name from "the

has partially repaid fraudulently obtained funds before discovery of the scheme. We hold that a sentencing court, in determining the amount of loss caused by a Ponzi scheme, must estimate the actual, attempted, or intended loss and that the estimated loss must be reasonably based on the information available to the court.

## I. BACKGROUND

Orton was an employee of BP Oil Company (BP Oil). When he fell behind in making payments on the American Express account provided to him by the company, he instigated a Ponzi scheme to make money. He began the scheme in early 1988 and continued it until March 1993, well after the time he left BP Oil in September 1988.

Orton told friends, relatives, and acquaintances that, as an employee of BP Oil, he could invest in an incentive program BP Oil had for its executives. He further told them that the investments would mature in a few months and would yield a high rate of return. He persuaded 44 victims to purchase investment "units." As part of the scheme, Orton used money "invested" by later victims to pay "interest" to earlier victims, providing the successful image necessary to entice new victims and to encourage additional "investments" by other victims. Orton was not an executive of BP Oil; BP Oil did not have an executive investment program; and Orton did not use the money to make investments. The scheme ended in 1993 when the FBI, following an initial investigation, obtained

notorious swindler, Charles Ponzi, who, starting in 1919, received $9,582,000 within a period of eight months by inducing investors to give him $100 for the promised repayment of $150." *Id.* (citing *United States v. Boula,* 932 F.2d 651, 652 n. 1 (7th Cir.1991)).

a warrant and searched Orton's residence and business.

The total amount Orton received from all victims was $525,865.66. The total amount he returned to the victims was $242,513.65. The net amount lost by all victims was, therefore, $283,352.01, which was also the total amount gained by Orton. Only 12 of Orton's victims received back more money than they invested. The total amount lost by the other victims, those who suffered individual net losses, was $391,540.01.[3]

A Presentence Investigation report (PSI) was prepared, and sentencing hearings were held on June 23, 1994, and July 21, 1994. For Orton's violation of 18 U.S.C. §§ 1343 and 1341, the PSI found a Base Offense Level of 6 pursuant to U.S.S.G. § 2F1.1(a) (Fraud and Deceit). The PSI recommended that the offense level be enhanced: (1) by 9 levels pursuant to § 2F1.1(b)(1)(J) for an offense involving a loss of more than $350,000; (2) by 2 levels pursuant to § 2F1.1(b)(2)(A) and (B) for an offense involving more than minimal planning and more than one victim; and (3) by 2 levels pursuant to § 3A1.1 for an offense involving a vulnerable victim. The PSI also recommended that the offense level be reduced by 3 levels pursuant to § 3E1.1(b) for acceptance of responsibility. Prior to the sentencing hearing, Orton filed objections to the PSI. At the sentencing hearing, the court, finding that Orton used his specialized knowledge of the oil

---

[3]The presentence investigation report erroneously shows this amount to be $389,800.85. Apparently the $1,740.00 lost by Kim Simmons was omitted from the total because of a clerical error. For purposes of sentencing in this case, the difference is insignificant as both amounts fall within § 2F1.1(b)(1)(J), "More than $350,000."

business to entice victims, enhanced the offense level by 2 levels pursuant to § 3B1.3 for use of a special skill to facilitate the offense. Otherwise, the court adopted the recommendations in the PSI.

## II. DISCUSSION

Section 2F1.1(b)(1) of the Sentencing Guidelines requires that the offense level for an offense involving fraud or deceit be enhanced if the loss exceeded $2,000 and specifies the appropriate enhancement based on the amount of loss. U.S.S.G. § 2F1.1(b)(1). Application Note 7 defines "loss" as "the value of the money, property, or services unlawfully taken" and indicates how loss should be calculated for certain types of fraud. *Id.* at comment. (n. 7). It does not, however, suggest a method for calculating loss in a Ponzi scheme where part of the scheme itself is to pay "interest" to early victims from the money "invested" by later victims in order to create the illusion of a successful investment program.

As a general matter, § 2F1.1 applies to a wide variety of fraud cases. U.S.S.G. § 2F1.1, comment. (backg'd). The Sentencing Guidelines make clear that "loss" under § 2F1.1(b) is a specific offense characteristic intended to measure the actual, attempted, or intended harm of the offense. *Id.* § 1B1.3, comment. (n. 5); *Id.* § 2F1.1, comment. (n. 7). This measure of harm focuses on the victim's loss. *See United States v. Wilson,* 993 F.2d 214, 217 (11th Cir.1993) ("victim's direct loss" is a primary determinant of the appropriate sentence under § 2F1.1).

When considering the loss or harm caused by the fraudulent

conduct, the sentencing court must make a reasonable estimate, given the available information. U.S.S.G. § 2F1.1, comment. (n. 8). Fraudulent schemes, however, come in various forms, and we must consider the nature of the scheme in determining what method is to be used to calculate the harm caused or intended.[4] With these general considerations in mind, we proceed to consider the Ponzi scheme in the case *sub judice.*

If one were to set out the different types of fraud, at one end of the scale would be theft-like fraud where the perpetrator intends to keep the entire amount fraudulently obtained.[5] On the other end of the scale would be contract fraud where the perpetrator, while fraudulently obtaining the contract, intends to perform the contract and to cause no loss to the victim. *See generally United States v. Kopp,* 951 F.2d 521, 529 (3d Cir.1991) (discussing intents involved in different frauds). A Ponzi scheme

---

[4]Application note 8 specifically authorizes the consideration of the nature and extent of the fraud. U.S.S.G. § 2F1.1, comment. (n. 8). The Sentencing Commission is clearly aware that different types of fraud may call for different methods of calculation. *See* U.S.S.G. § 2F1.1, comment. (n. 7) (setting forth additional factors to be considered in determining the loss or intended loss in various types of fraud). Thus, while § 2F1.1 sets forth the general framework for calculating loss, we will examine the nature of this particular offense to determine what method and factors are to be used. *See United States v. Shaffer,* 35 F.3d 110, 114 (3d Cir.1994) (indicating that a court is compelled to estimate the loss based on the particular offense); *United States v. Dickler,* 64 F.3d 818, 825 (3d Cir.1995) (holding that § 2F1.1 and commentary require the method of calculating victim's loss to correspond to the nature of the defendant's conduct).

[5]Application Note 7 indicates that frequently loss in fraud cases will be the same as the loss in a theft case. U.S.S.G. § 2F1.1, comment. (n. 7). This observation is most accurate where the fraudulent intent is to retain the entire amount as would be the intent in theft cases.

falls somewhere in between.  While the perpetrator fraudulently obtains the full amount of the "investment," he or she has no intent to keep the entire amount.  Indeed, the very nature of the scheme contemplates payments to earlier victims in order to sustain and conceal the fraudulent conduct.

In this case, the sentencing court conducted a detailed accounting of the losses incurred by each victim—a method which we shall call the "loss to losing victims" method.  The amount of loss was calculated by totaling the net losses of all victims who lost all or part of the money they invested.  This method takes into consideration the nature of a Ponzi scheme by holding a defendant fully accountable for all losses suffered by those victims who lose money, but does not allow the defendant to fully benefit from payments made to others.  It does not reward a defendant who returns money in excess of an individual's initial "investment" solely to entice additional investments and conceal the fraudulent conduct.

Appellant Orton advocates the "net loss" method, which estimates loss as the net loss to victims as a group.[6]  Under this method, the defendant will, for sentencing purposes, receive the full benefit of all of his return payments.  The "net loss" method, however, focuses on the gain to the defendant, which ordinarily *underestimates* the loss.  U.S.S.G. § 2F1.1, comment. (n. 8).

The "loss to losing victims" method, on the other hand, correctly focuses on the harm to the victims.  The individuals who

---

[6]The "net loss" method also measures the "net gain" to the defendant.

receive a "return" or break even on their "investment" are not victims for purposes of § 2F1.1. At most, they are unwilling pawns in the Ponzi scheme. These individuals may be exposed to a risk of harm by the Ponzi scheme, but the risk of harm should not be considered in estimating the loss under § 2F1.1. Under § 2F1.1, "the risk created enters into the determination of the offense level only insofar as it is incorporated into the base offense level. Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred." U.S.S.G. § 1B1.3, comment. (n. 5).

Consistent with § 2F1.1, the sentencing court estimated the actual losses caused by the Ponzi scheme. In this case, the "loss to losing victims" method employed by the court results in a more accurate estimate of loss to victims, and we therefore reject the "net loss" method advocated by Appellant. We hold that the district court's estimate of loss was reasonable and thus affirm.

We take this opportunity to address our concern that the Court's opinion today might be read to require the "loss to losing victims" method in every Ponzi scheme case. This opinion does not stand for that proposition. While the district court's detailed investigation is commendable, such an exhaustive inquiry is not required in every case involving a Ponzi scheme. The information available in this case allowed the sentencing court to accurately calculate the loss to each individual victim. Nonetheless, in estimating the loss in a Ponzi scheme, a sentencing court is not generally required to make detailed findings of individualized losses to each victim in every case. There are cases where it

would be unduly cumbersome, potentially requiring large expenditures of time and resources to determine large amounts of detailed information.  Such a rigid rule is not required by the Guidelines.  All that is required is that the court "make a reasonable estimate of the loss, *given the available information.*" U.S.S.G. § 2F1.1, comment. (n. 8) (emphasis added).  Where detailed information is not available, a detailed estimate is not required.

### III. CONCLUSION

We hold that the sentencing court's estimate of losses was correct.  In cases where a defendant has committed fraud by using a Ponzi or pyramid scheme, taking money from victims and giving part of it to other victims in order to further the scheme, the sentencing court must estimate the actual or intended loss to the victims.

AFFIRMED.