PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 04-4164, 05-3879, 08-1569

———————

UNITED STATES OF AMERICA

v.

FRANKLIN C. BROWN,
                                                    Appellant

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 02-cr-00146-2)
Honorable Sylvia H. Rambo, District Judge

———————

Argued December 16, 2009

———————

BEFORE: SLOVITER, JORDAN, and
GREENBERG, Circuit Judges

(Filed: February 23, 2010)

———————

Nathan Dershowitz (argued)
Amy Adelson
Dershowitz, Eiger & Adelson
220 Fifth Ave., suite 300
New York, NY 10001

Peter Goldberger (argued)
Pamela A. Wilk
50 Rittenhouse Place
Ardmore, PA 19003-2276

   *Attorneys for Appellant*

Martin C. Carlson
United States Attorney
Kim Douglas Daniel (argued)
Assistant United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108-0000

   *Attorneys for Appellee*

-------------------

OPINION OF THE COURT

-------------------

GREENBERG, Circuit Judge

I.     INTRODUCTION.......................................................3
II.    BACKGROUND..........................................................4
III.   JURISDICTION..........................................................8

IV. DISCUSSION..............................................8
    A.    The Rule 33 Motion.............................9
        1.    The Receipt of the Noonan Tapes..........9
        2.    Allen's Preliminary Report...................12
        3.    The Evidence at Trial..........................13
        4.    Owen's Report....................................15
        5.    The Motion under the All-Writs Act....16
        6.    The Initial Motion for a New Trial.......18
        7.    The Renewed Motion for a New Trial..19
        8.    The District Court Did Not Abuse its
              Discretion.............................................26
    B.    The Pre-Trial Suppression Motion..................33
    C.    The Plea Agreement........................................39
        1.    The Terms of the Agreement...............40
        2.    Judge Rambo's Letter..........................41
        3.    The Chambers Meeting........................42
        4.    Application of Rule 11(c)(1)................45
        5.    Abuse of Discretion Standard..............50
    D.    The Sentence...................................................54
        1.    The Sentencing Proceedings.................55
        2.    Post-Booker Sentencing
              Requirements.......................................60
        3.    Unreasonableness of Sentence..............61
V.    CONCLUSION.........................................................63

# I. INTRODUCTION

This matter comes on before this Court on Franklin Brown's consolidated appeals from: (1) a judgment of conviction and sentence entered by the District Court on October 15, 2004, reflecting the sentence the Court imposed

3

on October 14, 2004; (2) an order denying Brown's motion for a new trial entered by the District Court on August 10, 2005; and (3) an order denying Brown's renewed motion for a new trial or for dismissal of the indictment entered by the District Court on February 22, 2008. For the reasons that follow, we will affirm the judgment of conviction and the orders denying Brown's motion for a new trial or dismissal of the indictment, but will remand the case for Brown's resentencing in light of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

## II. BACKGROUND

Brown worked for the Rite Aid Corporation, the operator of a chain of retail drug stores, for more than 30 years, eventually rising to become one of its top executive officers, before resigning in 2000. From 1995 until 1999, while Brown was serving as Rite Aid's Chief Legal Counsel and then as a Vice Chairman of its Board of Directors, Martin Grass was Rite Aid's Chief Executive Officer. Under Grass's leadership, Rite Aid aggressively expanded its operations by acquiring and building hundreds of drugstores throughout the United States. This expansion seemingly was rewarded with soaring profits, and Rite Aid's stock price rose by more than 300% between the date that Grass assumed control of the company and the beginning of 1999.

Troubles within Rite Aid surfaced, however, when it released a statement in March 1999 revealing significantly lower than expected earnings and higher than expected

expenses, resulting in its stock losing more than half of its value in a single day. After the value of Rite Aid stock continued to slide over the next several months, the Rite Aid Board of Directors on October 18, 1999, issued a press release announcing that Grass was resigning as CEO and that Rite Aid intended to restate its income negatively for fiscal years 1997-1999. Rite Aid's new leadership then launched an internal investigation that culminated on July 11, 2000, in a restatement of income of more than one billion dollars for fiscal years 1998, 1999, and the first quarter of fiscal year 2000.[1] When Rite Aid made the July 11, 2000 restatement it was the largest restatement of corporate income in United States history.

The Rite Aid problems naturally triggered public investigations. Thus, the Securities & Exchange Commission commenced a civil probe into Rite Aid's accounting practices and the Federal Bureau of Investigation, in conjunction with the United States Attorney's Office for the Middle District of Pennsylvania, launched a criminal investigation. FBI agent George Delaney and Assistant United States Attorney ("AUSA") Kim Douglas Daniel led the criminal investigation.

As the criminal investigation progressed, Brown retained counsel and notified the government of this representation. On February 12, 2001, AUSA Daniel contacted Brown's counsel and arranged a meeting between government representatives and Brown for April 4, 2001. On

---

[1]Rite Aid did not restate its earnings for fiscal year 1997.

March 28, 2001, AUSA Daniel faxed Brown's counsel an agenda letter setting forth the topics to be discussed at the April 4 meeting. Brown, however, became unwilling to meet with the government, a change in position that led Brown's counsel on or about March 30, 2001, to inform AUSA Daniel that Brown would not consent to participate in the interview.

During the time that the government was communicating with Brown, it also was in contact with Timothy Noonan, Rite Aid's President and Chief Operating Officer during Grass's tenure as CEO. Noonan informed the government that, in response to Brown's request, he had agreed to meet Brown on March 13, 2001. Noonan agreed to act as a confidential informant for the government and surreptitiously record his conversation with Brown. Agent Delaney instructed Noonan to steer the conversation towards the topics listed in the agenda letter that AUSA Daniel had sent to Brown's counsel. Noonan attached a hidden microphone to his body, met with Brown as planned, and recorded their conversation. Pursuant to Noonan's request, Brown and Noonan met again on March 30, 2001, and Noonan again recorded their conversation. In order to focus the conversation on topics related to the government's investigation, Noonan brought a letter addressed to Noonan's counsel signed by AUSA Daniel to the March 30 meeting. The government created the letter solely for use at that meeting and it purported to set forth a discussion agenda for an upcoming meeting between Noonan and the government. This fictitious letter listed topics of discussion similar to those in the letter that AUSA Daniel had sent to Brown on March 28, 2001.

Noonan also recorded conversations with Brown on April 1, 2001, April 27, 2001, and May 21, 2001, as well as his conversation with Grass and Brown on May 2, 2001. Furthermore, an FBI surveillance team made video tape recordings of each of Noonan's conversations with Brown during this period except for that on April 27.

On June 21, 2002, a grand jury in the Middle District of Pennsylvania returned a multi-count indictment against Grass, Brown, Franklyn Bergonzi, and Eric Sorkin arising from the Rite Aid investigation. Bergonzi and Sorkin, respectively, had served as Rite Aid's Chief Financial Officer and Vice President in Charge of Pharma Purchasing. The indictment charged Brown with numerous counts of conspiracy, fraud, making false statements to the SEC, obstruction of justice, and witness tampering.

Brown was convicted at an ensuing jury trial of conspiracy to commit accounting fraud, filing false statements with the SEC, conspiracy to obstruct justice, obstruction of grand jury proceedings, obstruction of government agency proceedings, and witness tampering. In particular, the jury found that Brown had conspired to inflate Rite Aid's reported earnings for fiscal year 1999, had conspired to create backdated severance letters awarding Brown and other executives millions of dollars in compensation, and had interfered with the government's investigation of Rite Aid in a variety of ways. The District Court sentenced Brown to ten years in prison followed by two years of supervised release.

Brown has surrendered to the Bureau of Prisons and presently is incarcerated.[2]

## III. JURISDICTION

The District Court had jurisdiction over this federal criminal action pursuant to 18 U.S.C. § 3231, and we have jurisdiction to review the judgment of conviction and sentence pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## IV. DISCUSSION

On this appeal, Brown puts forward a panoply of reasons that he claims require us either to dismiss his indictment, grant him a new trial, or remand his case to the District Court for resentencing though, interestingly, he does not suggest that the evidence at the trial was insufficient to support his convictions. Specifically, Brown maintains that the District Court: (1) abused its discretion when it denied his Rule 33 motion based on newly discovered evidence; (2) improperly denied his pre-trial suppression motion; (3) abused its discretion and committed plain error by interfering in the plea negotiation process; and (4) abused its sentencing

---

[2]Grass, Bergonzi, and Sorkin were not tried as they all pleaded guilty to certain charges pursuant to agreements with the government.

discretion in a variety of ways. We address each contention in turn.

### A. The Rule 33 Motion

Brown first argues that we should dismiss his indictment or grant him a new trial because forensic evidence suggests that the government tampered with the audio and video tape recordings of Brown's conversations with Noonan prior to disclosing those recordings to Brown and presenting the altered recordings as evidence at his trial.[3]

### 1. The Receipt of the Noonan Tapes

The government on July 24, 2002, shortly after Brown's arraignment, sent the attorneys representing Brown and his co-defendants audio tapes containing copies of the six surreptitiously recorded Noonan conversations (March 13,

---

[3]The District Court painstakingly set forth the technical details with respect to the recordings' authenticity in its comprehensive opinion denying Brown's renewed motion for a new trial. See United States v. Brown, No. 1:02-CR-00146-2, 2008 WL 510126 (M.D. Pa. Feb. 22, 2008). We do not restate those details except as necessary for our determination of whether the District Court's denial of Brown's motion challenging the recordings constituted an abuse of discretion.

2001; March 30, 2001; April 1, 2001; April 27, 2001; May 2, 2001; and May 21, 2001),[4] transcripts of each conversation except that of March 30, and a composite video tape consisting of footage taken by an FBI surveillance team of four of the six Noonan conversations (March 30, 2001; April 1, 2001; May 2, 2001; and May 21, 2001). In the letter enclosing these recordings, the government stated that the poor audio quality of the March 30 tape prevented the production of a complete transcript at that time.[5] Then on July 30, 2002, the government sent the defense lawyers an FBI surveillance videotape of the March 13 conversation, and

---

[4]We at times will refer to the audio tapes of the Noonan conversations the government sent Brown on July 24, 2002, as the "July 2002 copies."

[5]The letter from the FBI states that the March 13 conversation could not be transcribed, but Brown and the government agree that a transcript of the March 13 conversation was disclosed, and that the missing transcript was that of the March 30 conversation.

10

a 28-page rough transcript of the March 30 conversation.[6]

According to Brown, after he reviewed these tapes and transcripts, he "immediately recognized that there were radical differences between what [he] observed and heard on the tapes and what [he] recollected of the conversations." App. at 888. Though Brown considered retaining an expert to examine the tapes, his trial counsel initially discouraged him from taking that action, but on or about August 31, 2002, Brown nevertheless brought three of the six tapes to Bruce E. Koenig, an audio-forensic expert the FBI formerly employed, for examination. After Koenig listened to the tapes for several hours, he advised Brown that they were less than ideal samples because they were not originals or first-generation copies, but that Brown should not "waste [his] money" pursuing further examination of the tapes because, according to Koenig, the FBI never tampers with tape-recorded evidence. App. at 889.

---

[6]In order to produce this rough transcript, the government sent the tape of the March 30 conversation to an FBI laboratory to be enhanced. As we discuss below, the government claims it did not attempt to produce a more thorough transcript of the March 30 conversation because of the extremely poor audio quality of the tape and because the government believed the subject matter of the March 30 conversation to be redundant of the other recorded conversations.

11

## 2.    Allen's Preliminary Report

Although Brown claims that he remained convinced that there were substantial irregularities on the tapes, so far as we are aware he did not make any further investigation into the circumstances leading to their preparation to determine whether his belief was correct until approximately one year later when in August 2003 he retained forensic expert Stuart Allen to examine the audio tapes of the March 13 and March 30 conversations.  After conducting a digital examination of the tapes, Allen provided Brown with a "Preliminary Forensic Examination Report," dated September 17, 2003, containing the following preliminary conclusions with respect to the tapes of both conversations:

> Preliminary digital findings indicate that the audiocassettes examined in our laboratory were copies made from a digital original and contain anomalies of unknown origin. . . .

> The preliminary forensic examination of this subject tape identified several anomalies of unknown origin, however the results are inconclusive, since the examination was performed on a copy as previously stated and not the original.  The anomalies observed may have been the result of a faulty duplication process or some other unknown process yet to be identified.

12

> Therefore it is the professional opinion of this examiner that the <u>original recording device</u> and the <u>original media</u> associated with the subject recording, be produced and delivered for <u>non-destructive forensic examination</u> at this laboratory.

App. at 1165, 1167, 1168 (emphasis in original). Shortly after receiving Allen's report and three days prior to the date that jury selection was set to begin in Brown's trial, one of his lawyers sent an email message to AUSA Daniel inquiring whether it would be possible for Allen to examine the original tapes of the March 13 and March 30 conversations at Allen's place of business.[7] AUSA Daniel responded the next business day, September 22, 2003, stating "you gotta be kidding," and asking Brown's attorney to call him to discuss the request. App. at 1169. We are uncertain of AUSA Daniel's reason for taking that approach to Brown's request, though it may have reflected exasperation at the timing of the request.

### 3.   The Evidence at Trial

------

[7]As we explain below the trial had been scheduled to start in June 2003 but was delayed because of circumstances surrounding an attempt to reach a plea agreement.

13

The District Court empaneled Brown's jury on September 25, 2003, and the presentation of evidence began the next day. The trial transcript indicates that early in the proceedings Brown's defense counsel stated to the Court that Brown had "some nagging concerns about the technical aspects of the tapes," but acknowledged that the defense had raised these concerns with the government, and that "[t]he government has been completely cooperative in terms of providing [the defense] with what [it] need[s]." App. at 463. Defense counsel then agreed with the government that the Court should admit the tapes provisionally subject to Brown's right to object to technical aspects of the tapes if an expert examination of them later provided a ground for the objection.

During the government's case-in-chief, it displayed to the jury a presentation consisting of a video display of portions of the recorded Noonan conversations, synchronized with the matching audio recordings and a rolling transcript of the conversation projected across the screen (the "jury presentation"). The government had provided digital copies of the jury presentation to defense counsel several months in advance of trial. At the close of the prosecution's case, the government moved to admit into evidence the audio and video tapes of the Noonan conversations on which the government based its jury presentation. In so doing, the government noted that it had not shown the actual tapes to the jury but, instead, had shown it a computerized presentation generated from the tapes.

According to the government, it did not rely on or move to admit a tape of the March 30 conversation because

14

the recording from that date was largely inaudible, and, in any event, the subject of the March 30 conversation was duplicative of the other recorded Noonan conversations. The defense stated the government had given it an opportunity to review the tapes along with the digital presentation, and the defense agreed that they were accurate representations of the events recorded. The defense did not voice any objection to the tapes being admitted into evidence, but again reserved the right to object later to technical aspects of the tapes. The District Court admitted the tapes into evidence.

### 4. Owen's Report

During the trial, the FBI transported the original reel-to-reel analog tapes of the March 13, March 30, and May 21 conversations to its office in Harrisburg, Pennsylvania, where an FBI agent met with defense expert Tom Owen and allowed Owen to inspect, photograph, and download copies of the tapes onto Owen's laptop.[8] After conducting a physical and electronic inspection of the downloaded copies that consisted of "[c]ritical listening, tape enhancement, spectrum analysis, [and] speed correction," Owen issued a final report dated

_____

[8]We at times will refer to the tapes of the March 13, March 30, and May 21 conversations that the government made available to Owen at the FBI's Harrisburg office as the "Harrisburg tapes." We sometimes will refer to the copies of the Harrisburg tapes that Owen downloaded onto his laptop as the "Owen laptop copies."

15

October 12, 2003, concluding that the recordings of the three conversations he examined were "original and authentic within the conversation, but contain some very questionable recording procedures and anomalies." App. at 1204, 1206. Owen's report indicated that both the March 13 and March 30 tapes had been started and stopped a number of times before the actual recording began, but that the internal integrity of the recorded conversations was intact. The report also noted that the conversation recorded on the March 30 tape was at times unintelligible.

5. The Motion under the All-Writs Act

Brown did not call an audio forensic expert as a witness during his trial to challenge the authenticity of the Noonan tapes, and he did not object to the tapes being admitted into evidence. Nevertheless, following his conviction on October 17, 2003, Brown, aided by a new team of attorneys, continued to examine the tapes of the Noonan conversations for signs of hidden edits or inaccuracies. On July 7, 2004, Brown filed a motion under the All Writs Act, 28 U.S.C. § 1651, to place under seal and compel the examination and review of the original audio and video recordings of the Noonan conversations.[9] In his motion,

[9]Pursuant to the All Writs Act, "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. §

16

Brown argued that further examination, made subsequently to the trial, of the Owen laptop copies had "uncovered significant anomalies (suspicious acoustic events) which call into question the authenticity and originality of these tapes." App. at 636. In support of his motion, Brown attached reports from Allen and Owen and an affidavit from James Reames, a former FBI forensic technician.[10]

In a Memorandum and Order dated August 16, 2004, the District Court denied Brown's motion because (1) the Court found the timing of the motion suspect, (2) Brown did not make any suggestion that there were anomalies in the jury presentation, which was the only evidence actually considered by the jury, and (3) Brown's experts contended that only the third-generation copies—i.e., copies of the Owen laptop copies—contained anomalies in the conversation portion of the tapes. Because Owen's initial examination of the Owen laptop copies revealed anomalies only at the beginning of the tapes before the conversations began, the Court concluded that anomalies found in the conversation portions of later generation copies were a product of duplication error.

---

1651.

[10]It is unclear from the record whether Allen's and Owen's reports submitted in support of Brown's motion are those of September 17, 2003, and October 12, 2003, respectively. But we are not concerned with this uncertainty because Brown is not appealing from the District Court's denial of his motion under the All Writs Act.

17

## 6.     The Initial Motion for a New Trial

Even though he had been convicted and the Court had denied his motion under the All Writs Act, Brown continued to employ Owen, Allen, and Reames to test the Owen laptop copies and the jury presentation. On May 31, 2005, Brown filed a motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a new trial based on newly discovered evidence, or in the alternative, for (1) an order directing the government to produce to the defense for testing the original Nagra recorder and original Nagra SNST reel-to-reel audio tapes,[11] and the original VHS camcorder and VHS video tapes of conversations between Brown and Noonan, and (2) an evidentiary hearing.[12] In support of this motion, Brown averred that his defense experts, "meticulously" had tested the Owen laptop copies and the jury presentation, and had concluded after "painstaking, time-consuming work" that the

[11]The audio tapes of the Noonan conversations originally were recorded onto an analog recording device known as a Nagra SNST recorder. Federal law prohibits the possession of such recorders by private persons. See 18 U.S.C. § 2512(1)(b); App. at 1565.

[12]Although we refer to the May 31, 2005 motion as the initial motion for a new trial, Brown had filed an earlier motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 and a new trial pursuant to Fed. R. Crim. P. 33 on more conventional grounds than those we discuss here. The District Court denied that motion on May 6, 2004, and Brown does not appeal from that order. Therefore we do not discuss that motion further.

18

Harrisburg tapes proffered to Owen at the FBI offices were not original recordings, and that anomalies associated with computerized editing found in the Owen laptop copies and the jury presentation suggested that the government had edited both the Harrisburg tapes and the jury presentation. Consequently, Brown believed that the Harrisburg tapes and the jury presentation could not be deemed true and accurate records of the events that took place on the dates in question.

The government and the defense subsequently entered into an agreement, memorialized in an August 8, 2005 letter from defense counsel to AUSA Daniel, in which it agreed to provide the defense with the original audio and video tapes of the March 13, March 30, and May 21 Noonan conversations, a new set of FBI created first-generation duplicates of these recordings, the original Nagra SNST recorder on which the audio recordings of the conversations initially were made, and an additional working Nagra recorder. The letter agreement expressed the government's belief that the process of production should take no more than two weeks. On August 10, 2005, after being notified of the agreement, the District Court denied Brown's motion as moot, noting it also would be premature to rule on the motion at that time because Brown still was determining what, if any, newly discovered evidence existed.

### 7. The Renewed Motion for a New Trial

The government on November 9, 2005, released to the defense the original tapes of the March 13, March 30, and

19

May 21 conversations, as well as a set of first-generation digital copies of those tapes that the FBI made.[13]   After extensive examination, testing, and comparison by Brown's experts of the July 2002 copies, the Owen laptop copies, the November 2005 tapes, the FBI archive copies, the original Nagra SNST recorder, and the video tapes used to create the jury presentation, Brown presented his experts' findings in support of a renewed Rule 33 motion for a new trial that he filed with the District Court on September 28, 2006.

According to Brown, these findings "confirmed what [he] suspected all along: the government intentionally withheld exculpatory material from the defense and misrepresented the authenticity of the tapes furnished to the defense and incorporated in the Jury Presentation." App. at 1231.  Specifically, Brown contended that the government took the original analog recordings of the Noonan conversations, recorded them onto a digital format, deleted material exculpatory to Brown, and recorded the edited versions of the conversations from the digital format back onto the original analog reels.  The government then presented modified analog tapes to the defense as originals (the Harrisburg tapes and the November 2005 tapes) or as the source of the generational copies that were presented to the defense (the July 2002 tapes and the FBI Archive copies) and used to create the jury presentation.  Additionally, Brown

---

[13]We at times will refer to the original tapes that the government released to the defense on November 9, 2005, as the "November 2005 tapes" and the first-generation digital copies released on the same date as the "FBI Archive copies."

averred in his motion that the November 2005 tape of the March 30 conversation "is far more audible" than previously disclosed recordings of the conversation, and that the newly audible portions of that conversation contained exculpatory material. App. at 1231-32. Brown alleged that the government violated his rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963),[14] and the Jencks Act, 18 U.S.C. § 3500,[15] by failing to disclose a full transcript or an audible version of the March 30 conversation.

---

[14]The Supreme Court held in Brady that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97. "The Supreme Court has outlined a three-part test to determine if a Brady violation has occurred: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" Lewis v. Horn, 581 F.3d 92, 108 (3d Cir. 2009) (quoting Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272 (2004)).

[15]18 U.S.C. § 3500(b) provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to provide any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. . . ."

21

In support of his renewed motion, Brown submitted new reports and affidavits from Reames, Allen, Owen, and a forensic video expert, Grant Fredericks. These submissions included two new transcriptions of the March 30 conversation, one prepared by Reames (the "Reames transcript") and another prepared by Allen (the "Allen transcript"). Brown claimed these transcripts revealed exculpatory material not disclosed previously.

Specifically, Brown argued that both transcripts revealed statements contradicting Noonan's trial testimony about a computer the SEC subpoenaed that allegedly had been used to create backdated severance letters. At trial, Noonan testified that Brown had stated in the March 30 conversation that the SEC "will never get [the] computer now. It is in the Atlantic." App. at 1249. In the Reames and Allen transcripts, however, this statement does not appear and it is Noonan who first mentions the Atlantic Ocean. Reames transcribed the relevant exchange as follows:

> FRANKLIN BROWN: There are [. .] [. .] working on it.
>
> TIMOTHY NOONAN: In the Atlantic Ocean, huh?
>
> FRANKLIN BROWN: That was just an expression on his part . .
>
> TIMOTHY NOONAN: I understand that.

22

App. at 1426.  The conversation is transcribed similarly in the Allen transcript:

TIMOTHY:     OK Gottcha. (inaudible)

FRANKLIN:     Wo' What (inaudible)

TIMOTHY:     It's in the Atlantic Ocean!!! --- (pause).

FRANKLIN:     That was just an expression on his part.  That's the equivalent .. (inaudible)

TIMOTHY:     I understand that

App. at 2633.  Brown also claimed that the Reames transcript contained Brown's previously undisclosed statements encouraging Noonan to be forthright in his discussions with the government.  On appeal, however, Brown appears to concede that these statements were urging Noonan to be candid with Noonan's defense attorney, and at least were not urging Noonan directly to be candid with the government investigators.  See Appellant's Op. Br. at 61.

In Allen's reports and affidavits submitted with Brown's motion, Allen explained his testing methodology and noted a number of anomalies on the different recordings.  Allen's findings left him unable to "eliminate the possibility" that the November 2005 tapes were not recorded

23

contemporaneously with the events taking place in them, or that the recordings originated from a digital source instead of the analog recording device that the government purportedly used. App. at 1272-73; App. at 2571. Additionally, Allen concluded "with a high degree of certainty" that the July 2002 copies and the Owen laptop copies differed considerably from the November 2005 tapes and the FBI archive copies, such that it would be "reasonable" to conclude that the November 2005 and FBI archive copies were, in fact, different recordings than the earlier disclosed copies. App. at 1273-74; App. at 2572-73.

Owen's materials contained similar findings. He concluded that the November 2005 tapes showed evidence of previous digitization inconsistent with an analog recording. Owen also was "not able to eliminate the possibility" that the Owen laptop copies and FBI archive copies originated from different sources. App. at 2675. Allen and Owen also concluded that the video tapes that the government provided of the Noonan conversations contained evidence of editing.

Fredericks, in his affidavit, concluded that the video tapes the government provided to the defense were accurate originals, but that they had been converted into digital files and edited in order to create the jury presentation in such a manner that the resultant product was an "inaccurate and visually impaired reproduction" of the original video tapes. App. at 1468. Fredericks also concluded that the "[a]udio to video alignment of the DVD Jury Presentation was misaligned to such a degree that when the mouths of the men were moving, what was being heard by the jury, was not what they were actually saying at that exact time." App. at 1468.

24

The District Court held an evidentiary hearing on Brown's renewed Rule 33 motion on May 14 and 15, 2007. Over these two days, the District Court heard testimony from defense experts Owen and Allen, the government's FBI expert David Snyder, as well as from other persons including FBI case agents who had worked on the Rite Aid investigation. The government then sought an adjournment to seek discovery of the defense experts' test results and the District Court adjourned the hearing to allow additional discovery. The hearing resumed on August 13 and 14, 2007, and at that time the District Court again heard testimony from witnesses including Owen, Allen, Snyder, and Paul Ginsberg, a forensic audio consultant, who presented expert testimony on behalf of the government. Over the course of the four days of hearings, the District Court heard testimony from a total of nine witnesses and accepted 27 exhibits into evidence.

On February 22, 2008, the District Court entered an order denying Brown's renewed motion for a new trial. In its comprehensive accompanying Memorandum, the Court detailed the history of the various recordings made of the Noonan conversations as well as the evidence the numerous experts proffered, and concluded that the tapes the government provided were authentic, and that the government did not submit false evidence or perjured testimony to the jury. The Court also found that the Reames and Allen transcripts of the March 30 conversation did not contain exculpatory or impeaching information, and it therefore held that the government had not committed a Brady or Jencks Act violation in delaying the delivery of an audible recording or transcript of that conversation. The Court also concluded that a new trial was unwarranted because Brown's supposed "new

25

evidence"—a transcript of the previously inaudible March 30 statements—was not in fact newly discovered. See United States v. Brown, No. 1:02-CR-00146-2, 2008 WL 510126, at *28 (M.D. Pa. Feb. 22, 2008).

### 8. The District Court Did Not Abuse its Discretion

We will reverse a denial of a Rule 33 motion for a new trial based on newly discovered evidence only if we conclude that the district court abused its discretion in denying the motion. United States v. Saada, 212 F.3d 210, 215 (3d Cir. 2000). We have explained that "a district court abuses its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Montgomery v. Pinchak, 294 F.3d 492, 498 (3d Cir. 2002) (internal quotation marks and citation omitted). Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Our precedents instruct that five requirements must be met before a district court may grant a new trial on the basis of newly discovered evidence:

> (a)    the evidence must be in fact, newly discovered, i.e., discovered since the trial;

26

(b)     facts must be alleged from which the court may infer diligence on the part of the movant;

(c)     the evidence relied on, must not be merely cumulative or impeaching;

(d)     it must be material to the issues involved; and

(e)     it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States. v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006) (quoting United States v. Iannelli, 528 F.2d 1290, 1292 (3d Cir. 1976)).  A movant seeking a new trial on the basis of newly discovered evidence bears a "heavy burden" in proving each of these requirements.  Id. (citing Saada, 212 F.3d at 216).

We find no basis to conclude that the District Court abused its discretion in denying Brown's Rule 33 motion. Even if we assume for the sake of argument that Brown through his epic efforts after the trial satisfied the first four Iannelli factors listed above, in light of the Court's properly found facts, Brown failed to prove that his newly discovered

27

evidence probably would result in his acquittal at a new trial.[16]

After considering voluminous amounts of briefing, expert reports, and live testimony, the District Court made a factual finding that the various tapes of the Noonan conversations had not been "edited, altered, digitized, or manipulated by the government at any time," and that, accordingly, "[t]hey [were] authentic recordings." Brown, 2008 WL 510126, at *25. Brown claims that this finding of authenticity was clearly erroneous because (1) the Court based the finding solely on Ginsburg's expert testimony and the Court should not have allowed Ginsburg to testify, (2) even considering Ginsburg's testimony, the evidence did not support the finding of authenticity, and (3) evidence of breaks in the tapes' chain-of-custody further undermined the finding of authenticity.

---

[16]Actually it is questionable whether the evidence Brown presents in his attempt to show that the tapes had been altered is "newly discovered," and whether he was diligent in seeking it before the trial. If there had been alterations in the tapes as Brown believes, he should have known of them when he first heard the tapes and, indeed, he contends that he suspected from the outset that the tapes were inaccurate. Thus, he could have and should have developed his expert testimony before the trial. Instead, based on the advice of counsel, he did not take steps prior to trial to demonstrate that the tapes contained alterations of the sort allegedly discovered following his conviction.

28

Brown argues with respect to the first point that the government's request for an adjournment of the evidentiary hearing and subsequent use of Ginsburg as an expert was part of "a subterfuge seemingly designed to avoid having an FBI agent testify under oath that the tapes had not been altered," and that the District Court abused its discretion by allowing the government to engage in this subterfuge. Appellant's Op. Br. at 40. We are perplexed by this argument because, as the District Court found, there was testimony from FBI agents that the tapes had not been altered. In any event, the government claims that it sought the adjournment to obtain the test results from Owen and Allen in order to cross-examine them effectively, and that it based its decision to use Ginsburg on a perceived need to counter Brown's evolving allegations of evidence tampering with testimony from an independent expert, as opposed to testimony from a government employee (i.e., Snyder). Ultimately, the Court granted the adjournment to allow additional discovery, required Snyder to testify, and allowed Ginsburg to testify. The Court went to great lengths to consider all the evidence relevant to the issues before it, and we cannot conclude that the Court abused its discretion in making its determination to allow Ginsburg's testimony over Brown's objection, in addition to that of Snyder, Owen, Allen, and the other witnesses.

We also are unable to find any error in the District Court's conclusion that the tapes were authentic. As the Court noted, Brown's experts' detailed findings led them only to the lukewarm conclusions that it would be "reasonable" to believe that earlier disclosed recordings of the Noonan conversations came from a different source than the

November 2005 tapes, and that the possibility the recordings were inauthentic could not be eliminated. While a different fact-finder might have reached a conclusion contrary to the one the Court reached, the record by no means compels a conclusion that the tapes were inauthentic. Given the history of the proceedings and the conflicting expert testimony, both between the government and defense experts and among the defense experts themselves, we cannot conclude that the Court clearly erred by finding the challenged tapes were authentic.[17]

It also is important to consider that, as the District Court explained, it had evidence "from the FBI agents, that they did not themselves, or cause another person to, edit, alter, or modify the original tapes except to attempt enhancement" and that this testimony "was credible." Brown, 2008 WL 510126, at *25. Certainly in the face of somewhat conflicting expert testimony this lay evidence was important and the Court could rely on it.

Even were we to reject the District Court's finding and hold the tapes inauthentic, Brown does not demonstrate, or even seriously contend, that any of the conversations allegedly removed by the government from the Noonan tapes actually was exculpatory, much less that their admission as trial evidence probably would have resulted in his acquittal.

---

[17]We see no reason with respect to the chain-of-custody issues Brown raises to second-guess the District Court's determination that the testimony of the government's witnesses on this point was credible.

Moreover, even if we presumed that the government would not expend the effort to tamper with evidence in the manner ascribed to it by Brown to remove statements that were not exculpatory, Brown still bears the "heavy burden" of demonstrating that his newly discovered evidence probably would result in his acquittal at a new trial, and he simply did not meet this burden. Assuming Brown's argument to be that if we make a finding that the tapes were inauthentic the consequence would be the suppression of all of the video and audio recordings of the Noonan conversations, it does not follow a fortiori that a new trial without the recordings probably would result in Brown's acquittal, or that the original trial would have had a different outcome if the video and audio recordings had been excluded from evidence at that trial. As the District Court noted, Noonan testified at trial about his conversations with Brown, and "was cross examined thoroughly, on all topics that might impugn his credibility." Brown, 2008 WL 510126, at *28. The Court described the evidence at trial of Brown's guilt to be "concrete, credible, and more than sufficient to sustain his conviction." Id. On appeal, Brown fails to challenge this observation and plausibly explain how the absence of the Noonan tapes would have rendered the evidence at his original trial or would render the evidence at a new trial less than sufficient to sustain his conviction.

We agree with the District Court's conclusion with respect to the allegedly exculpatory statements in the Reames and Allen transcripts of the March 30 conversation that the statements were, at best, neutral as to Brown's guilt or innocence and not exculpatory. The statements regarding the Atlantic Ocean do not contradict substantially Noonan's

31

testimony on which Brown's counsel thoroughly cross-examined him at the trial. Moreover, we disagree with Brown's argument that because attorneys have ethical obligations not to suborn perjury, see Nix v. Whiteside, 475 U.S. 157, 171-74, 106 S.Ct. 988, 996-97 (1986), Brown's statement urging Noonan to be candid with Noonan's lawyer is akin to a statement urging Noonan to confess wrongdoing at Rite Aid to the government. Therefore, even if the government could have produced a more audible version of the March 30 conversation, it is unlikely that the use of this version would have led to Brown's acquittal at his trial or would lead to his acquittal at a new trial. For the same reason, we agree with the District Court that the government did not commit a Brady violation and that any violation of the Jencks Act amounted to harmless error.

Finally, Brown's evidence with respect to the video tapes and the jury presentation suggests only that the government could have created a more polished presentation if it had the resources of Brown and his experts at its disposal.[18] At trial, Brown conceded that the video tapes and jury presentation were accurate representations of the events recorded, and, on appeal, Brown does not offer any evidence which could give rise to an inference that exculpatory material on the video tapes somehow was hidden from him. Accordingly, we will affirm the order denying Brown's

---

[18]Frequently our review of criminal cases makes it clear that the government's resources devoted to the trial exceeded those of the defendant. This case does not seem to be within that category.

motion for a new trial entered by the District Court on August 10, 2005, and the order denying Brown's renewed motion for a new trial or for dismissal of the indictment entered by the District Court on February 22, 2008.

B.      The Pre-Trial Suppression Motion

Prior to the trial, Grass and Brown filed a motion to suppress the tapes of the Noonan conversations, arguing that the government had obtained them in violation of the 1998 "McDade Amendment," the provisions of which we describe below, by reason of AUSA Daniel, a government lawyer, having violated the Pennsylvania Rules of Professional Conduct by using Noonan as his proxy to elicit information from Grass and Brown about the subject matter of the government's investigation prior to their indictment but at a time when Daniel knew that they were represented by counsel with respect to that investigation. After holding a suppression hearing, the District Court issued an opinion on January 13, 2003, denying Grass's and Brown's motion. The Court held that AUSA Daniel had not committed an ethical violation by using Noonan as a confidential informant, and that, even if he had done so, suppression was not an appropriate remedy for the violation. See United States v. Grass, 239 F. Supp. 2d 535, 549 (M.D. Pa. 2003). We review a district court's denial of a suppression motion for clear error as to the underlying facts, but exercise plenary review with respect to legal findings made in light of the district court's properly found facts. United States v. Coles, 437 F.3d 361, 365 (3d Cir.

33

2006) (citing United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003)).

At the time of the alleged violations, Rule 4.2 of the Pennsylvania Rules of Professional Conduct, known as the "no-contact rule," provided:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Pa. R. Prof'l Conduct 4.2.[19]   Rule 8.4(a) provides that an attorney has engaged in misconduct if he violates the Pennsylvania Rules of Professional Conduct through the acts of another.  Pa. R. of Prof'l Conduct 8.4.   Pursuant to the McDade Amendment an attorney that the federal government employs is subject to the ethical rules in each state where such attorney engages in that attorney's duties to the same extent and in the same manner as any other attorney in that state.  28 U.S.C. § 530B(a).   Accordingly, AUSA Daniel, a federal prosecutor in this Pennsylvania-based prosecution, was bound by Rule 4.2 at all times relevant to this appeal, and he ethically was not permitted to violate Rule 4.2 through the acts of a surrogate.

---

[19]An August 23, 2004 order amended Rule 4.2 to substitute "person" for "party" and "to do so by law or a court order" for "by law to do so."  Pa. R. of Prof'l Conduct 4.2, historical notes.

The government does not dispute seriously that at the time the Noonan conversations were recorded, Brown was a "party" within the meaning of Rule 4.2 as that rule is interpreted in Pennsylvania, or that Brown was represented by counsel and AUSA Daniel was aware of that representation. The question before us then is whether AUSA Daniel was "authorized by law" to use a confidential informant to communicate with a represented suspect in the course of a pre-indictment investigation. Relying largely on our decision in United States v. Balter, 91 F.3d 427 (3d Cir. 1996), the District Court answered this question in the affirmative.

In Balter, we found that a federal prosecutor did not violate New Jersey's no-contact rule[20] when he used a confidential informant to contact a represented person in the course of a pre-indictment investigation. We reached that conclusion because the rule did not apply to a criminal suspect prior to the commencement of adversarial proceedings against the suspect, and that even if the rule did apply, "pre-indictment investigation by prosecutors is precisely the type of contact exempted from the Rule as 'authorized by law.'" See id. at 435-36. After noting that New Jersey case law supported this latter point, we stated:

---

[20]The New Jersey rule provided at the time of Balter that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless authorized by law to do so." Balter, 91 F.3d at 435 (quoting N.J. R. of Prof'l Conduct 4.2).

35

Prohibiting prosecutors from investigating an unindicted suspect who has retained counsel would serve only to insulate certain classes of suspects from ordinary pre-indictment investigation. Furthermore, such a rule would significantly hamper legitimate law enforcement operations by making it very difficult to investigate certain individuals.

Id. at 436. We then observed that decisions of every other court of appeals to have considered a similar case have supported this conclusion except for a decision of the Court of Appeals for the Second Circuit. Id. (citing United States v. Powe, 9 F.3d 68 (9th Cir. 1993); United States v. Ryans, 903 F.2d 731 (10th Cir. 1990); United States v. Sutton, 801 F.2d 1346 (D.C. Cir. 1986); United States v. Dobbs, 711 F.2d 84 (8th Cir. 1983); United States v. Weiss, 599 F.2d 730 (5th Cir. 1979)). The Court of Appeals for the Second Circuit concluded in United States v. Hammad, 858 F.2d 834, 839-40 (2d Cir. 1988), that a federal prosecutor overstepped the boundaries of legitimate pre-indictment investigation by preparing a false grand jury subpoena to aid a confidential informant elicit admissions from a represented suspect.

Brown contends that Balter is distinguishable from this case because it dealt with the New Jersey rather than Pennsylvania ethical rules, was decided prior to the enactment of the McDade Amendment, and the government's conduct in the present case is far more egregious than the government's conduct in Balter. We find these distinctions unavailing. To begin, New Jersey's no-contact rule is virtually identical to Pennsylvania's, and both states have derived their version of

36

the rule from the American Bar Association's Model Rules of Professional Conduct.[21]  See Balter, 91 F.3d at 435 n.4.  We recognize that Brown correctly points out that we supported our holding in Balter that pre-indictment investigations by prosecutors were "authorized by law" with a citation to a decision from an intermediate New Jersey state appellate court for which there is no analogous Pennsylvania decision. See id. at 436 (citing State v. Porter, 510 A.2d 49, 54 (N.J. Super. Ct. App. Div. 1986)).  But our conclusion in Balter did not rest solely on the New Jersey state court decision and we do not believe the absence of an analogous Pennsylvania decision renders any less compelling our observations regarding the negative consequences that would follow from an outcome contrary to that we reach here.

We recognize that Congress passed the McDade Amendment in part to combat perceived abuses by federal prosecutors and require them to comply with state no-contact

---

[21]We note that New Jersey's rule has been interpreted to apply only after the initiation of formal adversarial proceedings, whereas Pennsylvania's rule is not so limited.  See Balter, 91 F.3d at 436 (citing State v. CIBA-GEIGY Corp., 589 A.2d 180, 183 (N.J. Super. Ct. App. Div. 1991)). This distinction in the overall coverage of the two rules, however, has no bearing on the scope of the "authorized by law" exception found in both rules, although in this case the alleged violation took place prior to the initiation of adversarial proceedings.  It is worth noting, however, that in New Jersey there would be that additional reason to hold that there had not been an ethical violation in the circumstances of this case.

37

rules.  See generally Note, Federal Prosecutors, State Ethics Regulations, and the McDade Amendment, 113 Harvard L. Rev. 2080 (2000).  But Congress did not enlarge on the type of conduct that state rules forbid.  Our inquiry therefore would be no different if AUSA Daniel had been a state prosecutor and we were entertaining an appeal from a state court conviction.  Nevertheless Brown argues that the McDade Amendment "supersedes cases such as Balter by making a particular state's rules, rather than general principles of ethics, applicable to the conduct of the federal prosecutor," and that, accordingly, AUSA Daniel ran afoul of Rule 4.2 because of the absence of a Pennsylvania statute or court decision expressly authorizing the conduct in which he engaged.  Appellant's Op. Br. at 69.  But we reject his argument because we do not believe the McDade Amendment prohibits federal prosecutors in Pennsylvania from using a well-established investigatory technique simply because the Pennsylvania courts have not considered whether such conduct is permissible.  After all, the Pennsylvania courts have not held that such conduct is impermissible.[22]

Finally, though we acknowledge that the government's conduct in investigating Brown gives us pause, we do not regard it as so egregious that it falls outside the realm of acceptable pre-indictment investigation.  Although the government created a fictitious letter addressed to Noonan's counsel that Noonan showed to Brown in order to guide the

---

[22]At least Brown has not cited to us any Pennsylvania case so holding and our research has not revealed that there is any such case.

topics of the March 30 conversation, Brown voluntarily agreed to the March 30 meeting with Noonan, the government's letter did not invoke the authority of the District Court or contain any forged signatures, the letter was not addressed to Brown, and the letter in no way purported to compel any action or inaction on Brown's behalf. Accordingly, we agree with the District Court that AUSA Daniel did not violate Rules 4.2 and 8.4(a) of the Pennsylvania Rules of Professional Conduct. Inasmuch as Brown, or for that matter any other government agent, did not commit an ethical violation in this case with respect to the fictitious letter or the March 30 meeting, the District Court properly denied Brown's pre-trial suppression motion.[23]

### C.     The Plea Agreement

Brown next seeks a vacatur of his sentence and a remand for resentencing in accordance with a proposed plea agreement that he reached with the government because of the manner in which the District Court dealt with the agreement. Specifically, Brown argues that the District Court violated

---

[23]We also agree with the District Court's conclusion that even if there had been an ethical violation, suppression would not have been the appropriate remedy. See, e.g., Hammad, 858 F.2d at 841-42 (although prosecutor had violated New York's no-contact rule by using "sham" grand jury subpoena to elicit admissions from represented suspect, the district court abused its discretion by ordering suppression as result of violation).

Rule 11 of the Federal Rules of Criminal Procedure by participating in the plea discussions between Brown and the government, and that the Court abused its discretion by improperly rejecting the plea agreement. If the Court had accepted the plea agreement the sentence that it could have imposed would have been shorter than the sentence it did impose following Brown's conviction at trial.

1. The Terms of the Agreement

By June 17, 2003, Grass and Bergonzi had entered into plea agreements with the government and agreed to cooperate in its investigation. Pursuant to the agreements, Bergonzi pled guilty to one count of conspiracy, and Grass pled guilty to two counts of conspiracy.[24] On June 24, 2003, several days before Brown's trial was set to begin before Judge Sylvia H. Rambo, Brown also entered into a plea agreement with the government. Under this agreement, Brown agreed to plead guilty to one count of conspiracy to obstruct justice, an offense carrying a maximum term of imprisonment of five years. The government agreed that upon entry of Brown's guilty plea, it would move to dismiss all of the remaining counts in the indictment against him.

The plea agreement further provided that if Brown adequately could demonstrate his acceptance of responsibility, the government would move at sentencing for

---

[24]Sorkin pled guilty on June 26, 2003.

a 3-level reduction in Brown's offense level under the United States Sentencing Commission Guidelines (the "Sentencing Guidelines" or "Guidelines") because Brown had "assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate its resources efficiently." App. at 439. The agreement also took into account Brown's pledge to cooperate with the government in its ongoing investigation and prosecution of the Rite Aid matter, and raised the possibility that if the government believed Brown had rendered it "substantial assistance," the government would recommend, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the District Court impose a sentence on Brown below the applicable Guidelines range.

2.     Judge Rambo's Letter

After receiving a courtesy copy of Brown's plea agreement on June 25, Judge Rambo sent a letter to AUSA Daniel, with a carbon copy to Brown's trial counsel, stating the following:

> As you are aware, I have decided to reject the proposed plea agreement which has been forwarded to my chambers. However, I will accept Mr. Brown's plea of guilty to Count 33 [for conspiracy to obstruct justice]. Attached to this letter, you will find a statement of reasons

41

for rejecting the agreement. I am planning on reading this statement in open court tomorrow. If you should have any questions, please contact me.

App. at 25. In the attached statement of reasons, Judge Rambo recited that the plea agreement was unacceptably lenient given the diverse range of serious crimes with which Brown was charged. Judge Rambo further found "particularly nauseating" the portion of the agreement indicating that Brown's timely acceptance of responsibility had allowed the government and the Court to allocate its resources efficiently. Judge Rambo understandably took that view of the acceptance of responsibility provision of the plea agreement because Brown did not agree to plead guilty until almost the eve of trial, i.e., between two and eight years after the conduct at issue took place. After noting that the government's proposal to drop all the other charges against Brown "essentially caps his prison sentence at 60 months," Judge Rambo stated that the proposed plea agreement "does nothing to eviscerate" the public's "perception that white collar defendants are given preferential treatment in our system of justice." App. at 29-30. Judge Rambo concluded her statement of reasons for rejecting the plea agreement by stating: "I must distance myself and the judiciary from this agreement. I will not accept this plea agreement." App. at 30.

3. The Chambers Meeting

42

The following morning on June 26, 2003, Judge Rambo held a meeting in her chambers to discuss Brown's plea situation with Brown's trial defense team and representatives from the United States Attorney's Office, including United States Attorney Thomas Marino. Obviously Judge Rambo's letter with the statement of reasons for rejecting the plea agreement had jolted the attorneys in the case. Brown's lead trial counsel, Reid Weingarten, began the meeting by explaining that as a result of Judge Rambo's letter, Brown was unwilling to plead guilty because he no longer believed he had a "fair shot" to argue for leniency in sentencing from the District Court. Id. at 453. Weingarten requested a continuance of the trial "to catch our breath" and attempt to "salvage th[e] deal." App. at 452. The government joined the defense's request for a continuance.

Over the course of the meeting, Marino made three statements that Brown characterizes as references to an ex parte conversation about Brown's case that the United States Attorney's Office had with Judge Rambo June 25, 2003. In one reference, Marino stated, "As an aside, I had a concern when the Court raised an issue — what you said to us yesterday as to was I giving away the farm? Because there is nothing I want more in this case than the Court to say that this is a fair and just agreement." Id. at 459. Marino then asked whether a "preliminary guideline check" that Judge Rambo stated the Court had made with the Probation Office had resulted in a Sentencing Guidelines calculation different from that the government had provided in the plea agreement. Id. at 458-59. After Judge Rambo indicated that the Probation Office indeed had come up with a different calculation, Marino responded, "That is what I think the problem is. I am

43

hoping that the facts we discussed with the Court yesterday and facts that we may be able to bring to the Court's attention in the future once we get — if we do get these continuances will resolve that matter." Id. at 460. Brown's attorney did not raise any objection to the Court proceedings at the meeting or at any time prior to this appeal on the ground that there had been ex parte or improper contacts between the government and the Court.

Following Marino's statements, Judge Rambo expressed her perception that, based on the facts known to her, Brown and Grass seemed equally to blame for the wrongdoing at Rite Aid, and that she did not understand why the government was treating Brown more favorably than Grass. Judge Rambo continued, "Now if there are facts that you have that you are going to present that wipe away that perception, then fine. I don't have that." Id. at 460.

Despite Judge Rambo's reservations, the transcript of the chambers conference suggests that during the period between when she sent the parties her letter and statement of reasons and the following day's conference, she had become more willing to consider accepting Brown's plea agreement. On one occasion, Judge Rambo stated she had "no problem accepting the plea" and that even if she did not accept the agreement, Brown would not receive a sentence heavier than he otherwise would receive, so long as the District Court's Guidelines calculation comported with that arrived at by the government. Id. at 458. On the second occasion, Judge Rambo stated she had "no problem with the plea," but that she "wanted to see what the guidelines were and then look at the plea in conjunction with the presentence report" as she had

44

done with Grass. Id. at 461. Additionally, Judge Rambo never read aloud her statement of reasons for rejecting the plea agreement even though her June 25 letter indicated her intent to do so. Nevertheless, Weingarten concluded the chambers meeting by reiterating that, in light of Judge Rambo's June 25 letter and statement of reasons, Brown was unwilling at that point to enter a guilty plea.

Several hours after the June 26 meeting, Judge Rambo entered an order granting Brown until July 14, 2003, to notify the Court of his plea decision. Of course, inasmuch as Brown did not plead guilty, the case ultimately proceeded to trial. The record does not reflect that there were any further plea negotiations between Brown and the government following the chambers conference and does not reveal how Brown communicated his decision not to enter a guilty plea to the Court.

4. Application of Rule 11(c)(1)

Brown first contends that the District Court violated Rule 11(c)(1)'s prohibition on judicial participation in plea negotiations. That rule allows an attorney for the government to discuss and reach a plea agreement with the defendant's attorney, but provides that "[t]he court must not participate in these discussions." Fed. R. Crim. P. 11(c)(1). When a defendant makes a Rule 11 objection for the first time on appeal, a court of appeals reviews the alleged violation on a

plain error basis.[25]  To succeed under this standard of review, a defendant must demonstrate that (1) the asserted violation of Rule 11(c)(1) was error, (2) the error was plain, and (3) the error affected the defendant's substantial rights; if these three conditions are met, then a court may exercise its discretion to notice the forfeited error, but only if (4) "the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  See United States v. Bradley, 455 F.3d 453, 461 (4th Cir. 2006) (quoting United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 1776 (1993)).

Brown claims the District Court violated the "core values" of Rule 11 by holding ex parte discussions with the government on the day that the Court received the plea agreement, and that the Court violated the letter of Rule 11(c)(1) by agreeing at the chambers conference to the government's proposal to provide further factual information

---

[25]If there is a timely objection in the district court to an alleged Rule 11 violation, a court of appeals exercises plenary review in determining whether there had been a violation.  United States v. Ebel, 299 F.3d 187, 190-91 (3d Cir. 2002).  Nevertheless, a court of appeals still will consider the record as a whole to determine whether the error affected a defendant's substantial rights or was merely harmless.  See id. at 191; Fed. R. Crim. P. 11(h).  We note that the use of the plain error standard is not without its critics.  See United States v. Baker, 489 F.3d 366, 371-72 (D.C. Cir. 2007).  Here, however, our result would be the same regardless of whether we exercise plain error or plenary review.

46

which might lead the Court to later accept the agreement. Appellant's Op. Br. at 85.

According to the government, the record does not establish that there were any ex parte discussions between the government and the District Court, and that even if there were such discussions, Brown did not raise a contemporaneous objection when he became aware of them, and he cannot establish now that as a result of those discussions there was plain error. The government also contends that the Court did not involve itself improperly in the plea discussions, noting that the Court's alleged involvement arose after Brown had entered into the plea agreement with the government.

The courts have viewed Rule 11's ban on judicial participation in plea agreements as serving several purposes:

> First, it diminishes the possibility of judicial coercion of a guilty plea, regardless whether the coercion would actually result in an involuntary guilty plea. Second, the judge's involvement in the negotiations is apt to diminish the judge's impartiality. By encouraging a particular agreement, the judge may feel personally involved, and thus, resent the defendant's rejection of his advice. Third, the judge's participation creates a misleading impression of his role in the proceedings. The judge's role seems more like an advocate for the agreement than a neutral arbiter if he joins in the negotiations.

47

United States v. Baker, 489 F.3d 366, 370-71 (D.C. Cir. 2007) (quoting United States v. Cannady, 283 F.3d 641, 644-45 (4th Cir. 2002)).  We consider Brown's Rule 11(c)(1) challenge in light of these purposes.

The record, in particular Judge Rambo's June 25, 2003 letter to AUSA Daniel and Marino's statements at the chambers conference the next day,  permits an inference that the government communicated with the District Court on June 25, 2003—the day it forwarded the plea agreement to the Court and the day before the chambers conference—although the context of these communications if they did occur is not immediately apparent.  The government  attempts to deny that there were such communications, arguing that the statements in the record are susceptible to multiple interpretations and that it would have been "extremely unlikely" and "foolish" for Marino to mention such conversations in the presence of defense counsel.  See Appellee's Br. at 78-79.[26]  Assuming that there were ex parte communications, however, Brown's experienced counsel apparently did not view them as

---

[26]We take the government's point to be that, since an ex parte communication clearly would have been improper, Marino's comments could not mean that such communications took place because no one would be inclined to admit to that kind of ethical breach.  We do not take the government's suggestion to be that if it had engaged in improper conduct the wise approach for it thereafter would have been to keep quiet about what had happened.  We trust that if the government came to recognize that it had acted improperly in a prosecution, it would reveal the facts and then let the matter proceed to an appropriate outcome.

48

problematic, or at least decided not to object to them if he did view them as improper, as he did not raise any objection either upon receiving Judge Rambo's June 25 letter or upon hearing Marino's statements at the chambers conference on June 26 or at any time thereafter.[27]

After our study of the record of what happened after Judge Rambo sent her June 25 letter, we are satisfied that Judge Rambo did not violate Rule 11(c)(1) as neither the alleged ex parte communications nor Judge Rambo's statements at the chambers conference took place until after Brown and the government had finalized the plea agreement. See Baker, 489 F.3d at 371 (there is "no room for doubt" that the "purpose and meaning" of Rule 11(c)(1)'s injunction on judicial involvement in plea negotiations "are that the sentencing judge should take no part whatever in any discussion or communication regarding the sentence to be imposed prior to . . . submission to him of a plea agreement") (quoting United States v. Werker, 535 F.2d 198, 201 (2d Cir. 1976)).  Here, by June 25, 2003, the plea negotiations were over and there was no risk that judicial pressure was going to influence the outcome of those negotiations.  Moreover, it is unclear how any ex parte conversations would have harmed Brown given the government's attempt persuade the Court to accept the plea bargain to which Brown had agreed.

Rule 11(c)(1) seeks to avoid a situation in which a court places pressure on a defendant to plead guilty

---

[27]Brown's attorneys on this appeal were not representing him in June 2003.

involuntarily. In this case, Judge Rambo's position led to the collapse of the plea agreement and had the opposite effect. Thus, though Brown may have lost the benefit of his bargain with the government because of Judge Rambo's position, he did not lose his right to be tried by an impartial jury of his peers and he surely was not coerced to plead guilty. In fact, quite to the contrary, Judge Rambo's actions caused him to adhere to his previously entered plea of not guilty even though he had been prepared to change his plea to guilty. Accordingly, even if we agreed with Brown that Judge Rambo violated the letter of Rule 11(c)(1) by discussing the plea negotiations at the chambers conference and agreeing to allow the government to provide additional factual information in support of a plea agreement, such error was harmless given that the parties did not reach a subsequent plea agreement. See Fed. R. Crim. P. 11(h).

5.      Abuse of Discretion Standard

Brown also contends that the District Court improperly rejected the plea agreement by distributing the letter to AUSA Daniel with the attached "statement of reasons" to counsel on June 25, 2003. On this point we first observe that the record by no means is clear that the Court ever rejected the plea agreement. The reality may be that Brown simply abandoned the agreement when he became aware of the Court's view of it. However, assuming that the letter and statement of reasons constituted a rejection of the plea agreement, we review the District Court's rejection of Brown's plea agreement for an abuse of discretion. See United States v. Hecht, 638 F.2d

50

651, 658 (3d Cir. 1981) (Weis, J., dissenting) (citing Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 498 (1971)); see also Government of the Virgin Islands v. Walker, 261 F.3d 370, 375 (3d Cir. 2001) ("A sentencing court can, of course, reject the results of a plea negotiation if it concludes that the resulting agreement is not in the best interest of justice.").

On the question of whether the District Court rejected the plea agreement it is clear that, on its face, Judge Rambo's June 25 letter and her accompanying "statement of reasons" would lead most reasonable readers to believe that the rejection of Brown's plea agreement was a foregone conclusion. By the next day, however, Judge Rambo clearly indicated a willingness to consider the plea agreement at the chambers conference. In this regard the record indicates that when Judge Rambo originally read that the plea agreement suggested that Brown's timely acceptance of responsibility had permitted the Court to allocate its resources efficiently, she reacted negatively, but by the next day she had softened her views.

Yet we need not determine if Judge Rambo actually rejected the plea agreement for even if we construe the "statement of reasons" as a formal rejection, she did not abuse her discretion in rejecting the agreement. Brown argues that Judge Rambo in issuing her "statement of reasons" abused her discretion because she displayed a predisposition to find Brown guilty and impose a substantial penalty, and because she improperly based her decision to reject the plea agreement on the circumstance that she and her staff had spent

51

substantial time and effort preparing for Brown's trial.[28]  We

---

[28]Brown also makes the novel assertion that once the District Court acknowledged the government's prerogative to dismiss certain counts in the indictment against Brown—i.e., the counts other than Count 33 for conspiracy to obstruct justice—the plea agreement became a Rule 11(c)(1)(B) agreement that the Court was compelled to accept.  See Fed. R. Crim. P. 11(c)(3)(A) (court has discretion to reject agreements under Rule 11(c)(1)(A) and (c)(1)(C)); In re Richards, 213 F.3d 773, 784-89 (3d Cir. 2000) (narrowly construing Rule 48's requirement that "leave of court" be obtained before a prosecution may be dismissed).  With the exception of Richards, which did not involve plea agreements, Brown does not cite authority for this position.  In any event, Brown's argument fails at the outset because, although the Court in its June 25 letter to AUSA Daniel did state it would accept Brown's guilty plea to Count 33, it did so while expressing its intention to reject all other aspects of the agreement.  Moreover, even though the Court at the next day's chambers conference did seem willing to accept the entire plea agreement, it never acknowledged that the government possessed a unilateral right to dismiss the remaining counts in the indictment because the plea agreement did not grant the government any such right.  In the agreement, the government agreed to move to dismiss the remaining counts upon entry of Brown's guilty plea to the conspiracy count.  Dismissal still hinged on the Court's granting of the government's motion, which it never could do because the government never filed the motion.  Hence, the agreement remained subject to Rule 11(c)(1)(A) and thus the Court had discretion to accept, reject, or defer a decision on the agreement until after its review of the

52

disagree. The grand jury charged Brown with an array of felonies which allegedly resulted in very serious financial harm to the Rite Aid Corporation and its shareholders, as well as obstruction of justice and witness tampering. The indictment charged Brown and Grass equally, and alleged they both were more culpable than Bergonzi and Sorkin. Yet the government in Judge Rambo's view inexplicably offered Brown a significantly more lenient plea agreement than it did Grass. Although Judge Rambo spoke harshly in describing why she felt Brown's plea agreement did not serve the interests of justice, if she actually rejected the plea agreement she did not abuse her discretion by so doing.

Brown draws our attention to Judge Rambo's statement that she found "particularly nauseating" the portion of the plea agreement indicating that the government would move for a reduction in Brown's offense level because Brown's timely acceptance of responsibility had allowed the government and the District Court to allocate their resources efficiently. Judge Rambo noted that Brown's decision to enter a plea agreement on almost the eve of trial had by no means prevented the Court and its staff from expending considerable effort preparing for trial. Brown reads these statements to mean that Judge Rambo rejected the plea agreement because of the time the Court had spent on trial preparation. Though we can understand why a district court would be frustrated if, after it expended great efforts to prepare for a trial, the parties in effect settled the case, as the court might wonder why they could not have reached their

_____

presentence report. See Fed. R. Crim. P. 11(c)(3)(A).

53

agreement earlier, we agree that ordinarily it would be improper for a court to reject a plea agreement solely because of its annoyance attributable to the parties' delay in reaching an agreement.[29]   The record demonstrates, however, that Judge Rambo's comments regarding timing referred specifically to the proposed Sentencing Guidelines 3-level reduction for Brown's timely acceptance of responsibility, and not to the acceptability of the plea agreement generally. Judge Rambo's hostility to this proposed reduction, though expressed harshly, was certainly understandable given the circumstances of the case of which she was well aware.  In fact, we, too, cannot understand how the parties seriously can have recited in the plea agreement that Brown's acceptance of responsibility was timely.  After considering all of Brown's arguments, we find no abuse of discretion in the District Court's reaction to Brown's plea agreement.

D.     The Sentence

The District Court sentenced Brown, who was 76 years old, to a ten-year term of imprisonment.  Brown argues that he is entitled to a remand for resentencing because this sentence, which the Court imposed after the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004), but before its decision in United States v.

---

[29]We are not suggesting that there never could be a situation in which a court appropriately could not reject a plea agreement on the basis of its untimeliness.

Booker, 543 U.S. 220, 125 S.Ct. 738, was unreasonable in a variety of ways. Specifically, Brown contends that the District Court abused its sentencing discretion by (1) failing to consider properly the factors listed at 18 U.S.C § 3553(a) or articulate a statement of reasons for the sentence pursuant to 18 U.S.C. § 3553(c), (2) improperly calculating the loss for which he was responsible under Section 2B1.1 of the Sentencing Guidelines, and (3) wrongly denying his motion for a downward departure based on his medical condition.

## 1. The Sentencing Proceedings

Following Brown's conviction, the Probation Office submitted a presentence report ("PSR") to the District Court. The PSR calculated Brown's base offense level at 6, but then included a 16-level enhancement based on the amount of financial loss for which Brown was responsible, calculated to be $38,113,383; a 2-level enhancement because the offense involved more than minimal planning; a 4-level enhancement because Brown was an organizer and leader of the conspiracy to obstruct justice; a 2-level enhancement for abuse of a position of trust; and a 2-level enhancement for obstruction of justice. Accordingly, the PSR calculated Brown's total offense level at 32, with a corresponding sentencing range of 121-151 months.

Brown filed objections to the PSR on the grounds that the loss calculation was incorrect and that the enhancement for an aggravated role in the offenses was improper. Brown also filed two motions for downward departures based on his

55

extraordinary civic and charitable contributions and on his age and physical condition. After holding two days of evidentiary hearings, the District Court entered a Memorandum Opinion discussing sentencing issues on August 17, 2004. See United States v. Brown, 338 F. Supp. 2d 552 (M.D. Pa. 2004).

In that opinion, the District Court concluded that, in light of the Supreme Court's decision in Blakely, the mandatory application of the Sentencing Guidelines to Brown's case was unconstitutional. The Court nevertheless used the Sentencing Guidelines as a "measuring point" for its analysis, but stated that it would base its ultimate sentencing determination on an "indeterminate scheme in accordance with the principles set forth" by a decision of the United States District Court for the District of Utah in United States v. Croxford, 324 F. Supp. 2d 1230 (D. Utah 2004).[29] Brown, 338 F. Supp. 2d at 555-56. The Court stated it would not issue an "alternative Guidelines sentence," but it nevertheless addressed Brown's challenges to the PSR, overruling his objections and denying his motions for downward departure. Id. at 556-62. With respect to the loss calculation, the District

---

[29]The court in Croxford held that application of the Guidelines would be unconstitutional pursuant to Blakely, and thus it approached the sentencing determination "as the courts handled sentencing before the Guidelines-by making a full examination of the relevant evidence and imposing an appropriate sentence within the statutory range set by Congress." 324 F. Supp. 2d at 1246. The Croxford court nevertheless determined what the sentencing range would be under the Guidelines and looked to that range for guidance. Id. at 1248-49.

56

Court accepted over Brown's objection the PSR's use of an "average selling price methodology" for determining the amount of shareholder loss that resulted from Brown's fraud, noting that other courts had sanctioned this method of loss calculation in recent accounting fraud decisions. Id. at 557 (citing United States v. Snyder, 291 F.3d 1291 (11th Cir. 2002); United States v. Bakhit, 218 F. Supp. 2d 1232 (C.D. Cal. 2002); United States v. Grabske, 260 F. Supp. 2d 866 (N.D. Cal. 2002)). Brown urged reliance on his expert, who conducted "an event study, which measures the out-of-pocket damages to investors by calculating the difference between the fraudulent mis-pricing in the price paid for the security and the inflation in the sales price," and calculated that there was no shareholder loss attributable to Brown's fraud. Brown, 338 F. Supp. 2d at 558.

As described by the District Court, the average selling price method "attempts to estimate the effect inflated earnings had upon the value of the company's shares by comparing the average selling price of the stock during the lifetime of the fraud to the average selling price after the fraud was disclosed or corrected via a restatement." Id. at 557 (citing Bakhit, 218 F. Supp. 2d at 1241). "Once an average loss per share has been established, it is multiplied by the number of harmed shares to estimate the total shareholder loss." Id. (citing Bakhit, 218 F. Supp. 2d at 1242). To calculate the loss attributable to Brown's misconduct, the Court's methodology looked at six-, seven-, and eight-day windows before and after Rite Aid's October 18, 1999 announcement that it intended to restate its income. The average losses per share over these three time periods then were multiplied by the total number of "innocent shares" (the total number of shares minus those

57

held by the Rite Aid defendants), reduced by the percentage of the total fraud for which Brown was responsible. The separate figures for the six-, seven-, and eight-day windows then were averaged to arrive at the final loss figure.[30]

Although the District Court accepted the PSR's methodology, it did disagree with the PSR's loss calculation in two respects, as it found that the amount of loss attributable to Brown's fraud should be discounted by a dividend Rite Aid

[30]It is unclear why the District Court focused solely on averages of arbitrary multi-day windows surrounding the October 18, 1999 announcement, given that Rite Aid's stock price was in a period of continuous decline both before and after this date, and that the effect of Brown's fraud on Rite Aid's stock price began at least as early as June 1, 1999, when Rite Aid reported its income for fiscal year 1999 to the SEC. Under a typical average selling price approach to loss calculation, sometimes referred to as a "rescissory" or "modified rescissory" approach, a court will calculate the average selling price of the security over the entire life of the fraud (the "average fraud price") and the average selling price during a period—often several weeks or more—following the fraud's revelation (the "average post-fraud price") then subtract the average post-fraud price from the average fraud price. The resulting loss per share then is multiplied by the number of affected shares to derive the total loss figure. See Bakhit, 218 F. Supp. 2d at 1240-42; Kevin P. McCormick, Untangling the Capricious Effects of Market Loss in Securities Fraud Sentencing, 82 Tul. L. Rev. 1145, 1165-66 (2008); Samuel W. Buell, Reforming Punishment of Financial Reporting Fraud, 28 Cardozo L. Rev. 1611, 1635-36 (2007).

paid to its shareholders on October 14, 1999, and that the government overestimated the number of shares harmed by Brown's fraud. After accounting for these adjustments, the Court determined that the amount of loss for which Brown was responsible was $23,170,452. The Court noted that this revision of the loss amount would not affect Brown's sentencing range under the Sentencing Guidelines, as his overall offense level remained at 32.[31]

The District Court denied Brown's motion for a downward departure based on his medical condition because it concluded that Brown "did not meet his burden of establishing that the Bureau of Prisons could not provide appropriate medical care for a person of [Brown]'s age and physical condition." Brown, 338 F. Supp. 2d at 562. The Court likewise denied Brown's motion for a downward departure based on his charitable and civic contributions, finding that although Brown was generous in these regards, his contributions were not extraordinary given his financial means.

The District Court imposed Brown's sentence at a hearing on October 14, 2004. At the hearing, the Court

_____

[31]Brown also objected to the PSR's loss calculation including amounts from rebate and settlement agreements that Rite Aid fraudulently had listed as income in its financial disclosures, and to the amount of loss attributable to the backdated severance letters. Additionally, Brown objected to the 4-level offense level enhancement based on his aggravated role. The District Court overruled all of these objections.

59

rejected additional sentencing objections that Brown raised with respect to his vulnerability to abuse and his medical condition. The Court noted with respect to Brown's medical condition that many defendants have similar problems and, in its experience, the federal prison system was very capable of dealing with defendants in Brown's situation. The Court also addressed Brown's charitable deeds, and, although it already had rejected his motion for a downward departure predicated on those deeds, the Court stated that Brown's "good deeds are very much acknowledge[d] . . . and I believe that is addressed in the sentence that will be given." App. at 94-95. The Court then sentenced Brown to a term of imprisonment of 120 months, one month below the minium Guidelines range.

2.      Post-Booker Sentencing Requirements

In considering a challenge to a district court's sentencing decision, we engage in two levels of review. First, we must ensure that the district court did not commit a significant procedural error in arriving at its decision, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." United States v. Wise, 515 F.3d 207, 217 (3d Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 597 (2007)). We review alleged factual errors for clear error but exercise plenary review over "purely legal" errors, such as a misinterpretation of the

Guidelines or the governing case law. United States v. Arrelucea-Zamudio, 581 F.3d 142, 145 (3d Cir. 2009). Second, if we determine that there has not been a significant procedural error, we review the ultimate sentence imposed to determine if it was substantively reasonable under an abuse of discretion standard. Wise, 515 F.3d at 218 (citing Gall, 552 U.S. at 51, 128 S.Ct. at 597).

As we have indicated, the District Court imposed Brown's sentence after the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, but prior to its decision in United States v. Booker, 543 U.S. 220, 125 S.Ct 738. In similar circumstances in other cases, we have remanded the case for resentencing unless the district court followed the procedures required after Booker. See United States v. Corley, 500 F.3d 210, 221 (3d Cir. 2007), vacated on other grounds, __ U.S. __, 129 S.Ct. 1558 (2009). We have held that these procedures require that in setting a sentence a district court must (1) calculate the applicable Guidelines range, (2) formally rule on any departure motions, and (3) exercise its post-Booker discretion by considering the factors in 18 U.S.C. § 3553(a) in setting the sentence it imposes regardless whether it varies from the sentence calculated under the Guidelines. United States. v. Olhovsky, 562 F.3d 530, 546-47 (3d Cir. 2009).

3.      Unreasonableness of the Sentence

Following Blakely, a district court must consider the factors that 18 U.S.C. § 3553(a) enumerates before sentencing

61

a defendant. Those factors include the nature and circumstances of the offense, the history of the defendant, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Additionally, the court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from the defendant's further crimes, and provide the defendant with needed treatment, training, or care.

"While sentencing courts need not discuss each of the § 3553(a) factors if the record makes clear the court took the factors into account in sentencing, where . . . the record strongly suggests that some of the statutorily prescribed sentencing factors were ignored, we cannot conclude that the resulting sentence was reasonable." Olhovsky, 562 F.3d at 547 (internal quotation marks and citation omitted); see also United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009) (en banc) ("In the wake of Booker, it is essential . . . that district courts provide courts of appeals with an explanation sufficient for [them] to see that the particular circumstances of the case have been given meaningful consideration within the parameters of § 3553(a).") (internal quotation marks and citation omitted). Here the District Court, based on the Supreme Court's reasoning in Blakely, correctly determined that the mandatory application of the Guidelines to Brown's sentence would be unconstitutional. The Court, however, being conducted by a judge not a prophet, was unable precisely to predict the effect that the Supreme Court's eventual holding in Booker would have on

62

federal sentencing. Lacking this clairvoyance the Court failed to explain, in the manner now required, how it considered the factors listed in section 3553(a) in imposing Brown's sentence. For this reason, we must remand the case to the District Court for resentencing. Because we remand for resentencing on this ground, we express no opinion on Brown's remaining sentencing arguments which, of course, he can advance at his resentencing.[32]

## V. CONCLUSION

---

[32]With respect to the District Court's loss calculation, however, we note that the legal landscape has changed somewhat since the time of Brown's sentencing. Notably, two courts of appeals explicitly now have applied the loss calculation principles that the Supreme Court has required in civil securities fraud cases, see Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627 (2005), in the criminal sentencing context, United States v. Rutkoske, 506 F.3d 170, 179-80 (2d Cir. 2007); United States v. Olis, 429 F.3d 540, 546-49 (5th Cir. 2005), another has opined that such an application would be appropriate, United States v. Nacchio, 573 F.3d 1062, 1078-79 (10th Cir. 2009), and a fourth has held that although a sentencing court need not follow Dura Pharmaceuticals's loss causation approach, it nevertheless must determine "how much of the shareholders' loss was actually caused by [defendant]'s fraud." United States v. Berger, 587 F.3d 1038, 1046 (9th Cir. 2009) (emphasis added).

63

For the reasons we set forth above, we will affirm the judgment of conviction but will vacate the sentence entered by the District Court on October 15, 2004, and we will remand the case for resentencing in accordance with this opinion. We will affirm the order denying Brown's motion for a new trial entered by the District Court on August 10, 2005, and the order denying Brown's renewed motion for a new trial or for dismissal of the indictment entered by the District Court on February 22, 2008.